**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **BARBARA OLSEN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 13 C 5384** |
| **v.** ) | |
| ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MICHAEL T. MASON, United States Magistrate Judge:

Claimant Barbara Olsen ("claimant" or "Olsen") brings this motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying Olsen's claim for Social Security Disability Benefits under the Social Security Act, 42 U.S.C. §§ 416 and 423. The Commissioner filed a cross-motion for summary judgment asking the Court to uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment [17] is granted and the Commissioner's cross-motion for summary judgment [22] is denied.

## I.     BACKGROUND

### A.     Procedural History

On June 18, 2010, Barbara Ann Olsen filed a Title II application for a period of disability and disability insurance benefits, alleging an onset of disability of January 2, 2010 due to chronic back pain. (R. 71.) Her application was denied initially on

September 13, 2010, and again on reconsideration on November 15, 2010. (R. 67-71, 80-84.) Olsen filed a timely request for a hearing. On February 6, 2012, Olsen appeared with counsel before ALJ Karen Sayon. (R. 31.) On April 5, 2012, ALJ Sayon issued a written decision denying Olsen's request for benefits. (R. 16-26.) Olsen filed a timely request for review with the Appeals Council on May 18, 2012. (R. 14-15.) On June 11, 2013, the Appeals Council denied that request, making the ALJ's decision the final decision of the Commissioner. (R. 1-6.)

## B. Medical Evidence

### 1. Treating Physicians

Olsen's medical records date back to 2006 with treating physician Dr. Samuel Mathew. On April 21, 2006, Olsen visited Dr. Mathew for pain in her right elbow and arm, which appears to have resulted from a work injury back in 2005. (R. 414, 421, 432.) Dr. Mathew assessed a sprain and recommended an MRI, X-Rays, and physical therapy, but Olsen refused. (R. 414.) Olsen returned to see Dr. Mathew for follow-up regarding her elbow and arm pain on July 27, 2006, October 25, 2006, and November 30, 2006. (*Id.*) At the final appointment, Dr. Mathew noted that Olsen's improvement was steady. (R. 414.)

On May 23, 2007, Dr. Mathew treated Olsen for mental anguish, anxiety, nervousness, and distress, which resulted from an attempted rape that occurred at work. (R. 415.) The physical examination was normal and she was advised to see a psychiatrist for follow-up care. (*Id.*) Olsen had two follow-up appointments with Dr. Mathew regarding her symptoms resulting from the attempted rape. (*Id.*) By the second follow-up appointment, her mental status had returned to baseline with the help of

psychiatric care.  (*Id.*)

On June 30, 2007, Dr. Mathew treated Olsen for mild vaginal discharge and lower abdominal pain.  (R. 416.)  Olsen tested positive for a urinary tract infection and Dr. Mathew prescribed Glucose, Terazol, Diflucan, Levaquin, and a ten-day course of Flagyl.  (*Id.*)  Also, Dr. Mathew recommended that Olsen receive a gynecological evaluation as soon as possible.  (*Id.*)

On July 16, 2007, Olsen visited Dr. Mathew complaining of muscle pain in her "upper trunk, neck, back and extremities."  (R. 416.)  She reported that movement of her extremities increased the pain and discomfort.  (*Id.*)  Dr. Mathew's physical examination revealed areas of tenderness on palpation at various spots, but otherwise normal results.  (*Id.*)  His impression included, fibromylagia, fibrositis, arthralgia, degenerative joint disease, and hypertension, among other things.  (*Id.*)  Dr. Mathew prescribed Elavil, Arthrotec, Flexeril and Tylenol, and noted that if symptoms persist, appropriate labs and x-rays would be needed.  (*Id.*)

Olsen returned on July 31, 2007, complaining of abdominal discomfort, nausea, and poor appetite.  (R. 417.)  After a positive H. pylori test, Dr. Mathew prescribed a fourteen day course of prevpac treatment.  (*Id.*)  He recommended an ultrasound of the abdomen.  (*Id.*)  Dr. Mathew again assessed hypertension, among other things, and recommended a low cholesterol, low sodium, and low triglyceride diet.  (*Id.*)  A month later, on August 31, 2007, Dr. Mathew treated Olsen for nocturnal leg cramps, pain and discomfort in her right knee, swollen legs, and cramping of her lower extremities.  (*Id.*)  Dr. Mathew observed edema in the feet and lower legs, a swollen right knee, and her veins were suggestive of early venous insufficiency.  (*Id.*)  He assessed possible

degenerative joint disease and arthritis of the right knee. (*Id.*) He ordered an ankle/brachial index study. (*Id.*) Olsen was advised to elevate her legs while resting and sleeping, and to wear special socks. (*Id.*) Dr. Olsen prescribed Celebrex and Tylenol for her discomfort. (*Id.*)

Olsen presented to Dr. Mathew on September 28, 2007 complaining of shortness of breath, congestion, throat irritation, sinus headaches, dizziness, and palpitations, among other things. (R. 465.) Pulmonary function testing revealed normal results. (R. 261-62.) She was treated for bronchitis and tonsillitis. (R. 465.) A month later, she continued to suffer from shortness of breath, palpitations, and dizziness. (*Id.*) Dr. Mathew planned to order a thyroid ultrasound for her mildly prominent thyroid, as well as carotid doppler studies. (*Id.*)

On November 24, 2007, Olsen presented with mild limping and painful joints, as well as shortness of breath during extended walking or activities. (R. 464.) Trace edema was observed. (*Id.*) Dr. Mathew recommended Tylenol to treat her arthritis/degenerative joint disease. (*Id.*) Olsen's dizziness and chest tightness persisted as of December 10, 2007. (*Id.*)

On December 17, 2008, Olsen underwent an MRI of the brain for her headaches and dizziness. (R. 440.) It was essentially normal with incidental prominent Virchow-Robin spaces. (*Id.*) The "[d]iminutive appearance of the basilar artery flow void raises question of possible basilar hypoplasia" and further testing was contemplated. (*Id.*) On January 8, 2009, Olsen underwent further imaging of the head for constant headaches and dizziness. (R. 425.) The bilateral vertebral and basilar arteries were small. (*Id.*) The reviewing physician was unsure whether this correlated to Olsen's symptoms. (*Id.*)

There was no evidence of major vessel occlusion, aneurysm, or arteriovenous malformation. (*Id.*) On the same day, Olsen underwent an MRA of the carotid arteries. (R. 424.) The radiologist found no significant stenosis. (*Id.*)

On March 9, 2009, a CT scan of the abdomen and pelvis was conducted to investigate Olsen's complaints of abdominal pain and constipation. (R. 427.) A low-lying enlarged cervix was observed with some fluid in the right of the rectum. (*Id.*) A pelvic examination was suggested to rule out abnormality in the vicinity. (*Id.*) On May 27, 2009, testing revealed that Olsen suffered from antral gastritis. (R. 446.) A colonoscopy revealed two polyps. (R. 448.)

An MRI dated June 16, 2009 of the lumbar spine showed mild central bulging of the L5-S1 intervertebral disc and generalized mild bilateral hypertrophic spurring of the facet joints. (R. 439.) Both right and left hips were normal. (*Id.*)

On January 8, 2010, Olsen presented to the MetroSouth Medical Center emergency department complaining of gradual onset of lumbar pain for the prior two days after lifting a case of bottled water. (R. 274.) She rated her pain a seven or eight on a ten-point scale. (R. 279.) She explained that bending, lifting, and movement exacerbate the pain. (R. 274.) The examining physician observed tenderness in the lumbar spine, as well as a decreased range of motion; he diagnosed back pain and a lumbar strain. (R. 274-75.) Olsen was given Vicodin and Flexeril in the hospital for the pain. (R. 275.) She was discharged the same day with instructions to follow up with her physician in two days. (R. 277.) She was prescribed Soma and Vicodin as needed. (*Id.*)

On May 31, 2010, Olsen returned to the MetroSouth emergency department, this

time complaining of chest pain for the past two weeks.  (R. 291.)  An EKG in the ER revealed no evidence of any acute myocardial necrosis.  (*Id.*)  Her blood pressure was elevated.  (*Id.*)  She was admitted for further monitoring and examined by Dr. Mathew. (*Id.*)  She described the pain as lasting for seven to ten minute intervals for the last twenty-four hours, and reported that she had been doing heavy lifting at work for the past several weeks.  (*Id.*)  Upon examination, Dr. Mathew noted mild questionable chest wall tenderness on palpation.  (R. 292.)  A stress test was conducted, which showed "no evidence of reversible myocardial ischemia" and was otherwise negative.  (R. 289.) Olsen was discharged in stable condition with instructions regarding diet, medications, and follow-up care.  (R. 289.)  Her discharge diagnoses included atypical chest pain, resolved, hypertension, hyperlipidemia, on treatment, and degenerative joint disease. (*Id.*)

During October 2010, Dr. Mathew treated Olsen for a possible urinary tract infection, as well as gastrointestinal problems.  (R. 404.)  Around that time, Dr. Mathew noted that Olsen's lungs were clear, that she had no neurological deficits, no edema, that she was ambulatory, and could move all extremities.  (*Id.*)  On October 13, 2010, Dr. Mathew ordered an MRI of Olsen's hips and pelvis for left hip pain radiating to the lower back.  (R. 360.)  That MRI showed normal results.  (*Id.*)  An MRI of the lumbar spine showed no disc bulging or herniation, and no central or foraminal stenosis.  (R. 359.)  There was, however, a small incidental Tarlov cyst in the right side of the sacral canal.  (*Id.*)  Dr. Mathew referred Olsen to physical therapy to evaluate and treat her back, left hip, and leg pain.  (R. 361.)

Olsen underwent physical therapy thirteen times between October 2010 and

6

December 2010 with Josepha Cabrera.  (R. 353-57.)  She explained that her pain

started on September 5, 2010 when she was sitting and watching television.  (R. 372.)

A few days later, she bent over to pick up an object and felt a sudden sharp pain in her

lower back.  (*Id.*)  She explained that her pain is always between an eight and nine on a

ten-point scale, and is aggravated when bending forward or during prolonged standing

while doing chores.  (*Id.*)  She reported difficulty getting up off the couch and sleeping on

her side.  (*Id.*)  Olsen further explained that she lives in a two-level house, in which she

is required to go up twelve steps to the bedroom.  (*Id.*)  She reported that she

occasionally used a cane when she had difficulty walking.  (*Id.*)  With the help of

physical therapy, Olsen hoped to "go back to normal and do things she used to do."

(*Id.*)  Cabrera recommended four to six weeks of therapy.  (R. 373.)

Throughout the course of physical therapy, Olsen's level of pain fluctuated and

she showed signs of improvement with an increase in the trunk range of motion and

hamstring flexibility.  (R. 353-56.)  During most of her November sessions, she rated her

pain a five on a ten-point scale.  (R. 354-55.)  She did exhibit difficulty performing certain

tasks, such as changing positions, sitting, and bending forward, and, as a result, some

exercises were modified to minimize aggravation of the Tarlov cyst.  (R. 366.)  Though

her pain continued, Olsen was discharged from physical therapy on December 3, 2010

and advised to continue her exercises at home.  (*Id.*)

On November 6, 2010, Olsen saw Dr. Mathew and complained of fatigue,

dizziness, occasional leg edema, and chest discomfort.  (R.  404.)  Dr. Mathew's

physical examination revealed trace edema, and that the distal lower extremity pulses

were minimally decreased.  (*Id.*)  He assessed hypertension and degenerative joint

disease, among other things, and advised Olsen to continue her low sodium, cholesterol, and triglyceride diet. (*Id.*)

On November 11, 2010, Olsen was treated in the emergency room of South Suburban Hospital for constipation, back pain, and dizziness. (R. 342.) She underwent a CT scan, which revealed no significant findings. (R. 348.) Imaging of the abdomen revealed no evidence of mechanical obstruction or free air. (R. 349.) On November 20, 2010, Dr. Mathew treated Olsen for vaginal bleeding. (R. 463.) A few weeks later, she suffered from conjunctivitis, as well as bronchitis. (R. 462-63.) On December 31, 2010, she complained of exertional dyspnea, and occasional leg edema, which Dr. Mathew attributed to her hypertension and hypertensive cardiovascular disease. (R. 462.) He recommended further testing. (*Id.*)

On February 7, 2011, Dr. Mathew completed a form regarding Olsen's ability to perform sustained work-related physical activity throughout an eight-hour day. (R. 338-39.) According to Dr. Mathew, Olsen could only lift six to ten pounds, could stand and/or walk for less than one hour, and could sit for less than two hours. (R. 338.) He also reported that Olsen could never push or pull with her hands or feet, climb ladders or ropes, balance, stoop, kneel, crouch, or perform gross handling manipulations. (*Id.*) She could occasionally climb ramps or stairs, reach overhead, perform fine finger manipulations, and feel. (*Id.*) He did not identify any visual, communicative, environmental, or cognitive limitations. (*Id.*) He based these conclusions on the Tarlov cyst in Olsen's sacral canal and her "severe back pain and joint pain." (R. 339.) He did not cite any clinical or laboratory findings as requested, but it appears he may have attached the October 22, 2010 MRI showing the Tarlov cyst. (R. 337.) In Dr. Mathew's

opinion, Olsen has not been able to work full-time at anytime from January 2, 2010 through the date of his report.  (R. 338.)

On January 27, 2012, Dr. Mathew completed a vestibular disorder residual functional capacity questionnaire indicating that Olsen "claims that she has pain daily" and occasionally suffers from associated balance disturbances.  (R. 405.)  The balance disturbances result in extended periods of incapacitation, are unpredictable, can result from movement, and would interfere with the ability to maintain reliable attendance in a work setting.  (*Id.*)

### 2.    Agency Consultants

On September 7, 2010, Dr. Dinesh Jain evaluated Olsen for the Bureau of Disability Determination Services.  (R. 326-28.)  Olsen reported a long history of low back pain, increasing in intensity for the past two years.  (R. 326.)  She described the pain as an eight or nine on a ten-point scale.  (*Id.*)  On occasion, after walking for several blocks, the pain radiates to her right buttocks.  (*Id.*)  Olsen denied any history of numbness or tingling in the lower extremities, or any loss of strength or sensation.  (*Id.*)  She stated that she was diagnosed with lumbar disc disease and that surgery was suggested, which she declined.  (*Id.*)  She denied having undergone physical therapy, but reported having one spinal injection in May 2010.  (*Id.*)  Olsen reported that she could walk two or three blocks and climb one flight of stairs before having to stop due to pain in her lower back.  (*Id.*)  Dr. Jain also noted a history of hypertension, with, according to Olsen, no history of chest pain, shortness of breath, headaches or dizziness.  (*Id.*)

A physical examination revealed normal results.  Specifically, Dr. Jain noted that

Olsen exhibited a normal range of motion along all joints in the upper and lower extremities.  (R. 327.)  He observed no swelling or edema.  (*Id.*)  Olsen's grip strength, finger dexterity and fine manipulation were normal.  (*Id.*)  Her cervical spine was normal. (*Id.*)  Her lumbosacral spine flexion was ninety degrees; extension and lateral flexion were both ten degrees.  (*Id.*)  Straight leg raise was negative and he observed no neurological deficits in the lower extremities.  (*Id.*)  Olsen walked with a normal gait without an assistive device; she had no difficulty getting on and off the exam table, squatting and rising, tandem walking, heel or toe walking, or hopping on one leg.  (R. 327-28.)  Dr. Jain concluded that Olsen suffers from chronic low back pain with a history of occasional right-sided lumbar neuralgia to the right buttocks, but with no clinical evidence of neuropathy, as well as controlled hypertension.  (R. 328.)

On September 9, 2010, Dr. Bhatari Jhaveri completed a Physical Residual Functional Capacity ("RFC") Assessment.  (R. 329-36.)  He determined that Olsen could occasionally lift and carry fifty pounds, frequently twenty-five; could stand and/or walk and sit for six hours in an eight-hour day; and had no limitations on her ability to push and pull.  (R. 330.)  Dr. Jhaveri also found that Olsen should only occasionally stoop, and should avoid concentrated exposure to extreme cold and heat due to her history of coronary artery disease and atypical chest pain.  (R. 331, 333.)  He found no other postural, manipulative, visual, communicative, or environmental limitations.  (R. 331-33.) In support of these conclusions, Dr. Jhaveri cited to the normal results of Dr. Jain's physical examination, as well as the records from Olsen's recent trip to the emergency room for chest pain.  (R. 330, 336.)  Dr. Jhaveri's findings were affirmed by Dr. Reynaldo Gotanco on November 10, 2010.  (R. 457-59.)

On March 27, 2011, at the request of the ALJ, medical expert Dr. Laura Rosch, reviewed the evidence and completed a medical interrogatory regarding Olsen's physical impairments; she also provided her opinion as to Olsen's ability to do work-related activities. (R. 383-92.) Dr. Rosch concluded that Olsen suffers from the impairments of hypertension and lumbar degenerative disc disease, with no evidence of radiculopathy. (R. 390.) In Dr. Rosch's opinion, neither of these impairments met or equaled a Listing due to the normal results of the examination by Dr. Jain and the normal pulmonary function test, among other things. (R. 391.)

Specifically, Dr. Rosch concluded that Olsen could occasionally lift and carry eleven to twenty pounds and frequently up to ten pounds. (R. 383.) She could sit, stand, and walk up to two hours at one time without interruption, up to six hours total in one day, and does not require a cane to ambulate. (R. 384.) Dr. Rosch found no significant limitations in Olsen's use of her hands or feet, but opined that she could never climb ladders or scaffolds, could only occasionally climb stairs and ramps and stoop, and could frequently balance, kneel, crouch, and crawl. (R. 385-86.) She also concluded that Olsen must never be exposed to unprotected heights and could only occasionally be exposed to moving mechanical parts. (R. 387.) But she could frequently operate a vehicle or be exposed to humidity, dust, odors, cold, heat, or vibrations. (*Id.*) Dr. Rosch found no limitations in Olsen's ability to perform certain daily activities, such as preparing simple meals, maintaining personal hygiene, walking a block, climbing a few stairs, or using public transportation. (R. 388.)

## C.    Claimant's Testimony

Olsen appeared with counsel at the hearing before the ALJ on February 6, 2012

and testified as follows.  At the time of the hearing, Olsen was fifty-four years old and residing with her eighteen year-old son.  (R. 36.)  She obtained a GED and has a valid driver's license, though she testified that she sometimes has difficulty driving due to the pain in her right buttocks.  (R. 37.)

Olsen testified that she worked at Walmart from April 2008 through December 2011.  (R. 38.)  She first worked as a cashier, but was moved to the position of "greeter" at the end of 2010 after complaining about her back pain.  (R. 39.)  As a greeter, she alternated between sitting and standing.  (*Id.*)  Olsen testified that she quit her job as a greeter on December 28, 2011 after her supervisor told her she should not be sitting down.  (R. 38.)  After leaving Walmart, Olsen received unemployment benefits.  (R. 37.)

Prior to her work at Walmart, Olsen worked as a cashier at a number of grocery and retail establishments, including Big Lots and Shop & Save.  (R. 40.)  As a cashier, she was required to work on her feet all day, but was not required to lift more than twenty pounds.  (R. 40-41.)  Olsen also briefly worked as a housekeeper at the Tinley Park Convention Center.  (R. 41.)  Additionally, Olsen worked for Andrew High School as a custodian from 2003 to 2007.  (*Id.*, 183.)  As a custodian, Olsen cleaned bathrooms, buffed floors, and emptied trash cans, which involved lifting and pushing over fifty pounds.  (R. 41-42.)  Olsen testified that she left the job at Andrew after she was sexually assaulted.  (R. 42.)

Olsen testified that her biggest problem is the cyst on her back, which causes lower back pain.  (R. 44.)  Olsen testified that her back pain had gotten worse in December 2011, a month or so before the hearing.  (R. 51.)  She explained that the pain comes and goes and radiates down her right leg.  (R. 44.)  On a scale of one to ten,

Olsen described her "typical" back pain as a ten.  (*Id.*)  Vicodin alleviates her pain

entirely, and Tylenol reduces her pain to a seven on a ten-point scale.  (R. 45.)

However, she testified that she only takes Vicodin "every once in a while" because it

causes constipation.  (*Id.*)  Olsen also testified that she started using a cane a month

and a half before the hearing when it was prescribed by her doctor.  (R. 46.)  She also

attended physical therapy in the past, but had not been since October of 2011.  (R. 48.)

The physical therapy did provide some relief.  (R. 57.)

Olsen further testified that she suffers pain in her right knee when she sits down

for a long period or stands up too quickly.  (R. 49-50.)  Her knee bothered her while she

was working at Walmart, but she wore a brace to relieve the pain.  (R. 50.)  She also

testified that she underwent an x-ray and MRI with Dr. Mathew in 2011, but she did not

know the results of those tests.  (*Id.*)  Olsen also suffers from headaches every other

day associated with her high blood pressure.  (R. 47.)  She used to get dizzy spells, but

those stopped when she stopped taking Mobic.  (R. 58.)  Olsen explained that she sees

Dr. Mathew approximately once a month for her back and knee pain.  (R. 49.)  He

referred her to a specialist.  (*Id.*)

Olsen testified that in 2011 she only worked two days a week and generally

could stand for about an hour at a time.  (R. 51-52.)  At the time of the hearing, Olsen

claimed she does not stand as much, and could maybe stand for an hour if she was

leaning on something for support.  (R. 52.)  She testified that she could sit in one

position for fifteen to twenty minutes, could walk a half a block, and could lift and carry

five to ten pounds, though she claimed she hadn't done any lifting for the past year.  (R.

52-53, 57.)

On a typical day, Olsen gets up, has a cup of coffee, and then lays down on the couch and watches television for most of the day. (R. 53.) Although Olsen was doing chores with occasional breaks at the time she alleged her disability began, she stopped doing chores altogether six or seven months before the hearing. (*Id.*) Her son now does the chores around the house. (*Id.*) She does not have any hobbies. (R. 54.) Since her back pain has gotten worse (the last six or seven months), she tries not to leave the house if she doesn't have to. (R. 47, 56.)

When questioned by her attorney, Olsen testified that she applied for disability in 2010 because of problems with her elbow. (R. 55.) At the time she applied, her back pain was not as bad as it was at the time of the hearing. (*Id.*) She clarified that it has, however, been getting progressively worse for the past two years and that she started working a part-time schedule at the beginning of 2010 due to the pain. (R. 56.)

### D.  Vocational Expert's Testimony

Vocational Expert ("VE") Ruben Luna also testified at the hearing. The VE first classified Olsen's past relevant work. (R. 60.) He described her position as a cashier as light and unskilled, her position as a custodian as heavy and unskilled, and her position as a housekeeper as medium and unskilled. (R. 60-61.)

Next, the ALJ asked the VE to consider a hypothetical individual of the same age, education, and work history as Olsen who was limited to light work involving no climbing of ladders, ropes, or scaffolds, only occasional stooping and climbing of ramps and stairs, and no exposure to unprotected heights or dangerous moving machinery. (R. 61.) When asked by the ALJ whether such an individual could perform Olsen's past relevant work, the VE explained that the individual could perform work as a cashier, as

14

Olsen performed it and as generally performed. (*Id.*) The VE also testified that such an individual could work in other light and unskilled positions such as packager, counter clerk, and racker. (*Id.*) However, none of those positions would be available if the individual had to use a cane to ambulate. (R. 61-62.) Nor would the hypothetical individual be able to work if she was off task 30% of the time due to pain or side effects of medication. (R. 62.) The VE also testified that an individual could be off task up to 15-16% of the time before being eliminated from the work force. (R. 62-63.)

Following the hearing, the record was held open for thirty days so that Olsen's attorney could continue his efforts to collect additional records from Dr. Mathew, who was noted as a "very difficult doctor to pry records from." (R. 34, 63.) Claimant's counsel eventually sought an additional thirty days and also asked the ALJ to send a subpoena directly to Dr. Mathew. (R. 139, 241.) The ALJ issued that subpoena on March 7, 2012, though it appears Dr. Mathew did not produce any records directly to the ALJ. (R. 139, 245.) Ultimately, claimant's counsel submitted some additional records from Dr. Mathew and the record was closed. (R. 461-465.)

## II.   ANALYSIS

### A.   Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is greater than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider

the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence...[and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985)).

### B.    Analysis under the Social Security Act

In order to be entitled to disability insurance benefits, a claimant must be disabled under the Social Security Act (the "Act"). A person is disabled under the Act if he or she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the

claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 885-86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

ALJ Sayon applied this five step analysis. At step one, the ALJ found that Olsen had not engaged in substantial gainful activity since January 2, 2010, the alleged onset date. (R. 21.) At step two, the ALJ found that Olsen has severe impairments of hypertension, a Tarlov cyst, and lumbar degenerative disc disease. (*Id.*) Additionally, the ALJ found Olsen's dizziness, which was evidenced in the record, to be a non-severe impairment. (*Id.*) Next, at step three, the ALJ determined that Olsen does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 22.) In doing so, the ALJ specifically considered listing 1.04 (disorders of the spine) and the listings in section 4.00 covering cardiovascular symptoms. (*Id.*)

The ALJ went on to assess Olsen's RFC, ultimately concluding that she can perform light work as defined in 20 CFR 404.1567(b) except that she can never climb ladders, ropes, or scaffolds, can only occasionally stoop and climb ramps or stairs, and must avoid unprotected heights and dangerous and moving machinery. (R. 22-25.) Based on this RFC, the ALJ found that Olsen could perform her past relevant work as a cashier. (R. 25.) As a result, the ALJ found that Olsen has not been under a disability,

17

as defined in the Act, from January 2, 2010 through the date of the decision.  (*Id.*)

Olsen now argues that the ALJ erred by, for a number of reasons, failing to properly assess her credibility and failing to properly assess her RFC.  We address some of those reasons below.

### A.    The ALJ's Decision is Not Supported by Substantial Evidence.

Olsen first takes issue with the ALJ's credibility assessment, arguing that she improperly discredited her testimony for want of objective evidence, and improperly considered her application for unemployment benefits, among other things.

The ALJ is in the best position to determine the credibility of witnesses, and this Court reviews that determination deferentially. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)).  In other words, the Court will not overturn an ALJ's credibility determination unless it is patently wrong. *Id.*  To be patently wrong, an ALJ's determination must lack "any explanation or support."  *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *2.  It is well settled that an ALJ "may not reject a claimant's subjective complaints of pain solely because they are not supported by medical evidence."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

Here, although the ALJ does not solely rely on a lack of objective medical evidence in discrediting Olsen's complaints, the other reasons she offered for doing so

are either not supported by the record or are insufficient to support the credibility determination. First, the ALJ takes issue with Olsen's use of a cane, stating that she did not require a cane to ambulate at the consultative examination and that Dr. Rosch did not believe that a cane was medically necessary. However, Olsen testified that she really began to rely on the cane just a month or two before the hearing, well after the consultative examination, Dr. Rosch's review of the record, and Olsen's previous statements regarding her cane usage. Similarly, the fact that the record contains one note that Olsen was doing heavy lifting at work after her alleged onset date does not necessarily negate her testimony of limited activities.

The ALJ also relies on Olsen's decision to, at some point, apply for and receive unemployment benefits, thereby holding herself out as able to work. While the ALJ is permitted to give some consideration to a claimant's receipt of unemployment benefits, the Seventh Circuit recently noted that "attributing a lack of credibility to such action is a step that must be taken with significant care and circumspection." *Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014). The Court went on to explain that in the case of a progressive disease - there, degenerative disc disease - "it is especially possible that an applicant might, at the early stages of the disease's manifestation, be unsure of the limits of his physical capabilities and only later determine that his inability to find work was due to the fact that the physical toll taken by the disease was greater than he had thought." *Id.*

Here, there is no such careful analysis by the ALJ, nor is it clear when or how long Olsen even received unemployment benefits. Further, as Olsen points out, the ALJ herself acknowledged that had she found Olsen able to perform sedentary work in the

national economy, she still would have been determined disabled under the Act by way of the Grids.  (*See* R. 62.)  Thus, the correlation between an ability to work and a finding of non-disability is not so clear-cut here as in other cases to warrant the ALJ's blind reliance on Olsen's unemployment benefits.  All of this leaves us to conclude that the ALJ's credibility determination was not supported by substantial evidence.

Olsen also takes issue with the ALJ's decision to afford Dr. Mathew's opinions no weight.  In explaining her decision, the ALJ stated that Dr. Mathew appeared "to be just crediting the claimant's complaints" and questioned his failure to identify any clinical or laboratory findings to support his opinions.  (R.  25.)  The Commissioner is indeed correct that the ALJ need only afford a treating physician's opinion controlling weight if it is supported by objective medical evidence.  *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)).  However, as we mentioned above, it does appear that Dr. Mathew relied upon and submitted the MRI indicating the presence of a Tarlov cyst when formulating his February 2011 opinion.  The record also reveals that Dr. Mathew was the ordering physician for the majority of the tests Olsen underwent.  What is more, the ALJ had no problem affording agency physician Dr. Rosch's opinion "great weight" even though she also left blank the portions of the medical interrogatory asking her to cite the objective medical evidence supporting her findings.  Dr. Rosch only included brief notes at the conclusion of her opinion, failing to truly connect the dots between her findings and the medical records.  Thus, we fail to follow the ALJ's logic in affording Dr. Mathew's opinions no weight, while affording Dr. Rosch's opinions great weight.

In light of the ALJ's failure to properly assess Olsen's credibility and his

shortcomings in assessing Dr. Mathew's opinion, we conclude that remand is appropriate. We comment only briefly on one of Olsen's remaining arguments. Olsen argues that the ALJ failed to properly consider her dizziness. However, as the Commissioner points out, Olsen testified that she stopped suffering from dizzy spells when she discontinued taking Mobic. Thus, we see no error in the ALJ's treatment of Olsen's dizziness.

**III.     CONCLUSION**

For the reasons set forth above, Olsen's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. This matter is remanded to the Social Security Administration for proceedings consistent with this Opinion. It is so ordered.

**ENTERED:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: January 20, 2015.**